DMB:ZA
F.#2010R02201

# M11-039

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

   - against -

FARUQ KHALIL MUHAMMAD 'ISA,
   also known as
   "Faruk Khalil Muhammad 'Isa,"
   "Sayfildin Tahir Sharif" and
   "Tahir Sharif Sayfildin,"

          Defendant.

- - - - - - - - - - - - - - - - - - X

**UNDER SEAL**

C O M P L A I N T

Cr. No. _____
(T. 18, U.S.C., §§
 2332(b)(2) and 2339A)

EASTERN DISTRICT OF NEW YORK, SS:

     JOHN J. MAZZELLA, being duly sworn, deposes and says that he is a Criminal Investigator with the United States Attorney's Office for the Eastern District of New York and a member of the New York Federal Bureau of Investigations ("FBI") Joint Terrorism Task Force ("JTTF"), duly appointed according to law and acting as such.

## CONSPIRACY TO MURDER U.S. NATIONALS

     Upon information and belief, in or about and between September 2008 and the present, both dates being approximate and inclusive, within the extraterritorial jurisdiction of the United States, the defendant FARUQ KHALIL MUHAMMAD 'ISA, also known as "Faruk Khalil Muhammad 'Isa," "Sayfildin Tahir Sharif" and "Tahir

Sharif Sayfildin," together with others, while outside the United States, did knowingly and intentionally conspire to kill, willfully, deliberately, maliciously and with premeditation and malice aforethought, one or more nationals of the United States, to wit: United States military personnel, while such nationals of the United States were outside of the United States.

In furtherance of the conspiracy and to effect its objectives, the defendant FARUQ KHALIL MUHAMMAD 'ISA, also known as "Faruk Khalil Muhammad 'Isa," "Sayfildin Tahir Sharif" and "Tahir Sharif Sayfildin," together with others, committed and caused to be committed, among others, the following overt acts:

a.    On or about October 17, 2008, four Tunisian prospective suicide bombers, identified herein as Fighter 1, Fighter 2, Fighter 3 and Fighter 4, traveled from Tunisia to Ras el-Jadir, Libya.

b.    On or about March 20, 2009, the defendant advised another Tunisian individual, who was seeking to travel to Iraq to engage in suicide attacks, identified herein as Fighter 5, to "try to delete everything.  I mean everything off your computer.  Don't leave one character of information or anything behind.  Don't leave any of your belongings in the house.  Don't leave any trace."

c.    On or about March 20, 2009, the defendant instructed Fighter 5 as follows: "Do not forget to keep reading

Qur'an and repeat the famous prayers on the way until you meet with God."

d.    On or about March 31, 2009, Fighter 2 and Fighter 3 committed a suicide truck bomb attack on a police complex in Mosul, Iraq, in which at least seven individuals were killed and 17 were injured.

e.    On or about April 10, 2009, Fighter 4 committed a suicide truck bomb attack at the boundary of the United States Army's Forward Operating Base Marez in Mosul, Iraq in which five American soldiers were killed.

f.    On or about April 11, 2009, the defendant stated to one of his co-conspirators, identified herein as Facilitator 3, "Did you hear about the huge incident yesterday? Is it known? . . . He was one of the Tunisian brothers."

g.    On or about May 28, 2010, the defendant instructed his sister, who was living in Iraq, to "Go learn about weapons and go attack the police and Americans.  Let it be that you die."

h.    On or about January 21, 2010, the defendant instructed one of his co-conspirators in Iraq, identified herein as Facilitator 3, to "tell the one in charge at work" that he, meaning the defendant, was  "not just 100% but 1,000,000% with you.  He is with you on the doctrine, the loyalty and the enmity and everything one million percent."  He added, "Even if I can't

work over there, I can work here . . . . I mean even if I can't
work over there, I can get some business going here to benefit
us."

               i.   On or about February 12, 2010, the defendant
told Facilitator 3, "If I come over there, you know, then I want
the bride with the crown[1], not 70[2] at the beginning, you
understand."

             (Title 18, United States Code, Section 2332(b)(2))

<u>MATERIAL SUPPORT FOR TERRORISTS</u>

        Upon information and belief, in or about and between
September 2008 and the present, both dates being approximate and
inclusive, within the extraterritorial jurisdiction of the United
States, the defendant FARUQ KHALIL MUHAMMAD 'ISA, also known as
"Faruk Khalil Muhammad 'Isa," "Sayfildin Tahir Sharif" and "Tahir
Sharif Sayfildin," did knowingly and intentionally provide and
attempt to provide, and conceal and disguise the nature, location
and source of, material support and resources, as defined in 18
U.S.C. § 2339A(b), including personnel, including himself,
knowing and intending that the material support and resources
were to be used in preparation for and in carrying out a

---

[1] As described in paragraph 32, "bride with a crown" is a
reference to a telescopic rifle.

[2] As described in paragraphs 20 and 38b, "70" is understood be a
reference to 70 virgins in paradise, which itself used to refer
to martyrdom or suicide operations.

violation of Title 18, United States Code, § 2332(b)(2).

(Title 18, United States Code, Section 2339A)

FACTUAL ALLEGATIONS

The source of your deponent's information and the grounds for his belief are as follows:[1]

1. I have been a Criminal Investigator with the United States Attorney's Office for the Eastern District of New York for approximately 12 years. Prior to that I was a Special Agent with the United States Department of Labor, Office of Labor Racketeering, for approximately eight years. As a Criminal Investigator and Special Agent, I have participated in numerous investigations during the course of which I have conducted physical surveillance, executed court-authorized search warrants and used other investigative techniques to secure relevant information regarding various crimes. My information about this investigation comes from my personal participation in this investigation, a review of documents, e-mails, telephone calls and other physical and documentary evidence, and interviews of witnesses. I have also relied on information provided to me by other agents and law enforcement officials in the United States and foreign countries. Documents, e-mails and other recorded conversations, when referred to herein, are from summaries and

---

[1]     Because the purpose of this Complaint is to state only probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

draft translations; they are not direct quotes.  Where statements
of others are set forth, they are set forth in substance and in
part.

2.    Since 2009, Canadian, Tunisian and United States
law enforcement officials, including FBI agents and other law
enforcement personnel in the New York field offices of the FBI
and the JTTF, have been investigating a Tunisian foreign-fighter
facilitation network (the "facilitation network") that transports
jihadist fighters from Tunisia to Iraq to conduct suicide bomb
attacks against American and Coalition forces in Iraq.  The
defendant FARUQ KHALIL MUHAMMAD 'ISA, also known as "Faruk Khalil
Muhammad 'Isa," "Sayfildin Tahir Sharif" and "Tahir Sharif
Sayfildin," is a member of the facilitation network who lives in
Canada.

3.    The facilitation network has carried out at least
two suicide bomb attacks in Iraq.  On or about March 31, 2009,
two Tunisian suicide bombers who had traveled to Iraq with the
assistance of the facilitation network committed a suicide truck
bomb attack against an Iraqi police complex in Mosul, Iraq (the
"March 31 Attack").  At least seven people were killed and 17
people were injured in that attack.  On or about April 10, 2009,
a Tunisian suicide bomber who had traveled to Iraq from Tunisia
with the assistance of the facilitation network committed a
suicide truck bomb attack at the boundary of the United States

Army's Forward Operating Base Marez ("FOB Marez") in Mosul, Iraq (the "April 10 Attack").  Five American soldiers were killed in that attack and several were injured.  Several Iraqi citizens were also killed and injured.

4.  As part of the investigation, Canadian law enforcement obtained and executed a court-authorized wiretap and search warrants on the defendant's telephone, computer, and internet and email accounts.  Unless otherwise indicated, all of the defendant's electronic communications discussed herein were lawfully intercepted and recovered pursuant to the Canadian court-authorized wiretap and a Canadian court-authorized search of the defendant's computer.

<u>The October 2008 Group of Fighters</u>

5.  On or about October 17, 2008, four Tunisian jihadist fighters who had been recruited by the facilitation network, Fighter 1, Fighter 2, Fighter 3 and Fighter 4, traveled from Tunisia to Libya en route to Iraq.  Tunisian travel records indicate that all four men crossed the Tunisia/Libya border on October 17, 2008 and entered Ras el-Jadir, Libya.  Fighters 1, 2, 3 and 4 traveled via Syria to Iraq, reaching Iraq in approximately March 2009.  Two members of the facilitation network, identified herein as Facilitator 1 and Facilitator 2, helped coordinate the fighters' travel through Syria to Iraq.

6.  On or about March 20, 2009, approximately two days

after Fighters 1, 2, 3 and 4 had entered Iraq from Syria, the defendant FARUQ KHALIL MUHAMMAD 'ISA communicated over the internet with Fighter 5. The defendant asked: "And how are the brothers there in our place? Anything new about them?" Fighter 5 replied: "They are fine, praise God. They called yesterday. No my brother. There is nothing new so far." The defendant asked if Fighter 5 had spoken to them by phone, and Fighter 5 replied, "They contacted the brothers in Syria."

7. According to the father of Fighter 2, Fighter 2 left Tunisia for Libya on or about October 17, 2008. Fighter 2 and his father spoke approximately once a week for the next several months, and Fighter 2 always claimed to be in Libya. The last time Fighter 2's father spoke to Fighter 2 was in early March 2009.

8. According to the brother of Fighter 2, within one or two days of the March 31 Attack, he received a phone call from an unknown number. The caller asked him, using Fighter 2's real name, if he was the brother of Fighter 2. When Fighter 2's brother confirmed his identity, the caller stated, again using Fighter 2's real name, that Fighter 2 had "been martyred two days ago in combat with the Americans in Mosul." The caller repeated this statement three times, then said, "May God witness what I say. God is great. You will not be receiving any more calls."

9. According to the uncle of Fighter 2, he was

present when Fighter 2's brother received the phone call referenced in paragraph 8, spoke briefly to the caller, and then collapsed in tears. When Fighter 2's uncle picked up the phone, a man speaking in an Iraqi accent told him that Fighter 2 had been martyred in combat with U.S. forces in Mosul. The caller repeated this message twice and then hung up.

10. According to American military eyewitnesses to the April 10 Attack, at the time of the attack a five-vehicle American military convoy was exiting FOB Marez. They observed guards at the Iraqi police checkpoint to FOB Marez exchanging gunfire with a large dump truck. The truck proceeded past the checkpoint and drove towards the FOB Marez gate, passing four of the American military vehicles along the way. When the truck was about 50 yards from the fence, it detonated next to the fifth vehicle in the American convoy. The crater left by the bomb was approximately 60 feet deep.

11. On or about April 11, 2009, the day after the April 10 Attack, the defendant had the following electronic conversation with an Iraq-based member of the facilitation network, identified herein as Facilitator 3:

> [The defendant]: Did you hear about the huge incident yesterday? Is it known?
>
> [Facilitator 3]: Yes.
>
> [The defendant]: He was one of the Tunisian brothers
> . . .

[Facilitator 3]: Praise God, may God
acknowledge him.
...
[The defendant]: Amen.  And did you know the
details about it??

[Facilitator 3]: No

[The defendant]: [Fighter 6] told me.

12.  On or about April 12, 2009, in an electronic
communication with Facilitator 4, and referencing a prior
conversation with a sixth Tunisian jihadist fighter identified
herein as Fighter 6, the defendant stated:  "Yesterday, [Fighter
6] called me and said the big bangs were by one of the Tunisian
brothers."

13.  According to the father of Fighter 4, Fighter 4
left Tunisia on October 18, 2008 and never returned.  Fighter 4's
father received a text message from an Iraqi phone number on or
about April 3, 2009 that stated, "I am [Fighter 4].  I am in
Iraq."  On or about April 10, 2009, Fighter 4's father stated
that he received a phone call from an unknown number, and a man
speaking in an Iraqi accent said, "Your son [Fighter 4] is dead."

14.  On or about April 15, 2009, the defendant and
Facilitator 4 had the following exchange about Fighter 1's
"marriage."  As described in paragraphs 20 and 38b, the
investigation has revealed that members of the facilitation
network use the terms "marriage" and "marriage to 70 virgins" as
code for suicide attacks.

> [Facilitator 4]: I am not sure if [Fighter 1]
> got married yet or not.
> . . . .
> [The defendant]: Why?  Haven't you seen him?
> Are you keeping in touch?
>
> [Facilitator 4]: He called me a few days ago.
>
> [The defendant]: Have you seen each other?
>
> [Facilitator 4]: Security reasons.

15.  On or about April 26, 2009, Fighter 1 was arrested
in Mosul, Iraq.

### The March 2009 Group of Fighters

16.  In or around March 2009, the facilitation network
arranged to send four additional fighters from Tunisia to Iraq,
including Fighter 5, Fighter 6, and two other Tunisian jihadists
identified herein as Fighter 7 and Fighter 8.

17.  On or about March 20, 2009, the defendant had the
following electronic conversation with Fighter 5 about Fighter
5's preparations to travel to Iraq or — contrary to the
defendant's wishes — Afghanistan:

> [The defendant]: You said something about
> preparing yourself, God willing.
>
> [Fighter 5]: Yes, God willing.  Securing the
> way and exchanging the currency.  And packing
> the luggage.  And securing the brothers
> behind us.
>
> [The defendant]: Yes, but be careful my
> brother and make sure you pray about
> everything.
> . . .
> [Fighter 5]: God willing, the brothers there
> will send us to Kharisan.  This is an order

from the company/organization.
. . .
[The defendant]: Why?  And how?

[Fighter 5]: I told you it is an order.

[The defendant]: Where from?

[Fighter 5]: And as for the how, they will
look after that God willing.  Even the money
will come from them.

[The defendant]: And you are telling me
orders?  Where are the orders coming from?

[Fighter 5]: From the company/organization.
From where you are.

[The defendant]: Did [Fighter 1] tell you
this?

[Fighter 5]: No.  The one who got [Fighter 1]
in.

18.   The term "Kharisan" or "Khorisan" is often used to

refer to Afghanistan.  Historically, "Kharisan" or "Khorisan" was

the Persian name for the region spanning parts of present-day

Afghanistan, Iran and Turkmenistan.

19.   On or about March 22, 2009, the defendant had the

following electronic conversation with Fighter 5:

[Fighter 5]: The brothers in Syria have
approved the trip.

[The defendant]: Praise God.

[Fighter 5]: God willing we will be there
after two days.  Things will be fine, God
willing.
. . .
[The defendant]: May God make things easy for
you and for us.

[Fighter 5]: The brothers here told me not to tell anybody until we get there.

[The defendant]: Yes this is proper.

. . .

[Fighter 5]: Your friend [Facilitator 4] shouldn't know until we get there.  Then I will talk to him, God willing.

20.   Later in that same electronic conversation on or about March 22, 2009, the defendant and Fighter 5 had the following exchange regarding Fighter 5's preparations to travel:

[Fighter 5]: My brother, what do you advise me to do with my family?

[The defendant]: In what way?

[Fighter 5]: Should I leave a will with them? I never talked to them about leaving. Otherwise, they would never let me go.

[The defendant]: No.  No, I don't recommend this.  This will cause them to suffer after you . . . . Also, try to delete everything. I mean everything off your computer.  Don't leave one character of information or anything behind.  Don't leave any of your belongings in the house.  Don't leave any trace.

[Fighter 5]: Yes brother.  What else?

[The defendant]: Do not forget to keep reading Qur'an and repeat the famous prayers on the way until you meet with God.

. . .

[Fighter 5]: The family is the main problem, particularly my mother.

[The defendant]: Any particular problem?

[Fighter 5]: I am so concerned about . . . the shock.

[The defendant]: I don't know what to tell

you brother, but what I know now is that the
things we are about to do are duty on us.
. . .
[Fighter 5]: May God give you 74 to marry.
We want the virgins of paradise, not the ones
here.

[The defendant]: You come short, brother.
God is more generous than that.  It's
supposed to be 76 instead.

21.  On or about March 24, 2009, the defendant and

Fighter 5 had the following electronic conversation:

[Fighter 5]: We were about to take off today,
with God's help . . . The man who will take
us to Libya called us today after we prepared
our luggage . . . . And he broke his promise.
We are now looking for an alternative.

[The defendant]: This means he is not
religiously committed. . . . How many are
you?

[Fighter 5]: God willing, four.

[The defendant]: Praise God.  It is important
to be patient and wise and use logic and
reason.
. . .
[Fighter 5]: Brother we are committed to a
date.

[The defendant]: Yes, I know.
. . .
[Fighter 5]: Brother, if I don't call you
within the next three days, you would know
that I am either in jail or I crossed the
border.

22.  On March 25, 2009, in an electronic conversation

between the defendant and Fighter 5, Fighter 5 stated: "Thank God

brother, I found someone to take me.  God willing, maybe on

Monday or Tuesday."

23.   According to Tunisian government records, Fighter 5 attempted to cross the border from Tunisia into Libya in or around April 2009, but was detained and turned back.

24.   On or about April 14, 2009, the defendant had an electronic conversation with Facilitator 4 wherein Facilitator 4 asked, "What's the news from [Fighter 6] and [Fighter 5]?"  The defendant replied, "I haven't heard from them for a few days now."

25.   Later in that same conversation, the defendant and Facilitator 4 had the following conversation about "farming."  As indicated in paragraph 37, the investigation has revealed that members of the facilitation network use "farming" as code for terrorist attacks.

> [The defendant]: What's up with you?
>
> [Facilitator 4]: Not much I haven't been going to work for the last while.
>
> [The defendant]: Why?  Do you mean farming?
>
> [Facilitator 4]: Yes . . . . We have no work. And the door is closed for volunteers.
>
> [The defendant]: How could that be when there are a lot of operations?
>
> [Facilitator 4]: The government is trying to infiltrate through to us
>
> [The defendant]: Oh no. What about the hypocrites?
>
> [Facilitator 4]: The work is progressing, praise God.

[The defendant]: Infiltration comes only through our own people . . . . I mean hypocrisy and reverting are increasing.

[Facilitator 4]: This is why the door is closed to volunteers.

<u>Arrests of Facilitation Network Members</u>

26.   On or about April 21, 2009, Facilitator 4 and his brother, identified herein as Individual 1, were arrested near Mosul, Iraq by officers of the United States Department of Defense.   Facilitator 4 was subsequently debriefed by FBI agents.

27.   On or about the same day, the defendant had the following electronic conversation with Iraq-based Facilitator 3:

[The defendant]: What is wrong today you woke up early?

[Facilitator 3]: Yes, by god, I have bad news.

[The defendant]: What is it

[Facilitator 3]: [Facilitator 4] and [Individual 1] were arrested by the Americans . . .
[The defendant]: Do they know him and did they take any books or phones with him

[Facilitator 3] I do not know

[The defendant]: Try to tell mother to go to their house and to make sure from [Facilitator 4's] wife but from [Facilitator 4's] wife herself and no one else . . . And to ask her if they had taken any books

28.   On or about April 18, 2009, Facilitator 2 was arrested in Al Basrah, Iraq and subsequently debriefed by FBI agents.

29.   On or about May 16, 2009, the defendant had the following electronic conversation with Facilitator 3:

[Facilitator 3]: Brother be cautious

[The defendant]: I do not understand you, why you say be cautious?
. . .
[Facilitator 3]: Do you remember [Facilitator 1] the friend of [Facilitator 2] from Syria?

[The defendant]: Yes

[Facilitator 3]: They were reported and so was [Facilitator 2]
. . .
[The defendant]: This is a dangerous talk and is there any proof????
. . .
[Facilitator 3]: They had arrested him in the apartment . . . in Syria.

[The defendant]: How then [Facilitator 1] reports them and gets arrested too . . .

[Facilitator 3]: Yes and he told them that [Facilitator 2] is in Al Basrah
. . .
[The defendant]: This talk is far from the truth but one has to be cautious. <u>If this talk is true then that person has told them about me too.</u> . . . Try to erase everything that you had written to me or anyone else at the end of the session . . . Because they were there, brothers from Tunis.

## The Defendant's Plan to Become a Fighter for the Network

30.   Electronic surveillance has revealed several instances where the defendant indicated a desire to travel to Iraq, both to personally engage in martyrdom operations and to obtain weapons and facilities from terrorist networks in Iraq to use in attacks in North America.

31.   For example, on multiple occasions the defendant asked Facilitator 3, who is based in Iraq, to procure for him a telescopic rifle with a silencer, which, as described below, he referred to using the code term "mute bride with a crown."  On or about December 22, 2009, in an electronic communication between the defendant and Facilitator 3, the defendant asked, "Listen can't you find me a bride?"  Facilitator 3 responded, "Yes.  How do you want her?  To be a talker or to be mute?  There is no mute ones."  The defendant replied, "I want her to be mute, and to have a lot of children, I want a lot of children."  Facilitator 3 said, "There are plenty available over here."

32.   On or about January 25, 2010, in a phone conversation between the defendant and his Iraq-based mother, the defendant explained as follows about his desire for a "mute bride with a crown":

> [The defendant]: Do you remember when I asked
> [Facilitator 3] for the bride with the crown
> but didn't have money? . . . I mean, do you
> know the long one with the telescope? . . .
> The one that shoots from very far, and it has
> a telescope. . . <u>Yeah, I've named this one as
> the bride with the crown</u>. . . . Do you know
> how useful this would be?  You would be
> sitting in your house and hit Baghdad right in
> the middle of it from there.  Yeah honestly,
> and especially if it has this tiny nozzle at
> the front, that doesn't release the sound.
> They put this at the front to capture the
> noise.  The call this the silencer. . . . I
> named this mute.  The bride with the crown,
> but mute. . . . She's tall, I've named her a
> bride because she's so beautiful.  The crown
> means the telescope that's mounted on top of

it.

33.   On or about January 21, 2010, the defendant and
Facilitator 3 had the following electronic exchange, during which
the defendant requested that Facilitator 3 put him in touch with
someone high up in the facilitation network so that the defendant
could offer that person his help in achieving the network's aims.

> [The defendant]: I want you to do this favor
> for me.  This is only favor I ask you in this
> world my brother.  Tell the one in charge at
> work to send my greetings to the head of the
> company.  This is the only thing I am asking
> in this life.  Okay brother.
>
> [Facilitator 3]: God willing – the company ...
> the head of the company they don't know him in
> the –
>
> [The defendant]: When a boss knows a boss,
> they can pass the information.  There are a
> lot of benefits in this thing, God willing....
> When you see the one in charge, tell him about
> me.
>
> [Facilitator 3]: Til now, I haven't seen him
> yet.  Only –
>
> [The defendant]: You know this is not a simple
> thing  and  it  requires  these  things.
> Particularly these days where there are many
> thieves.  One has to be vigilant on all sides.
> You  know  what  I  mean?  .  .  .  One should be
> smart and wise.  Be careful of computers and
> phones.  A lot of trouble can come out of
> them.
> .  .  .
> [The defendant]: You just try to make the
> recommendation through the phone.  Say to him:
> "He is not just 100% but 1,000,000% with you.
> He is with you on the doctrine, the loyalty
> and the enmity and everything one million
> percent."
> .  .  .

[The defendant]: Try to do this for me and add some goodness to it. Because I am sitting here suspended like on fire, neither here nor there. Sometimes when one feels so much guilt, one would say nothing would help more than the work of farming.
. . .
[The defendant]: Try to work on it. <u>Even if I can't work over there, I can work here . . . . I mean even if I can't work over there, I can get some business going here to benefit us</u> or the — But don't say these things to any of the normal workers. Only with the boss.

[Facilitator 3]: Yes, God willing. I have a friend who can –

[The defendant]: Don't tell these things to just anyone.

[Facilitator 3]: He is in charge.

[The defendant]: <u>Tell him that I used to send workers before. . . . Yes, say, "He was able to send workers before, praise to be Allah"</u> ....Yes brother but try to be very careful and be smart when you talk to him. Don't tell him these things over the phone. Tell him you have something important to talk to him about ....Even when you meet someone, or when you go meet someone, or when you go about your work, make sure to turn your phone off. Or better yet, remove the battery from it.
. . .
[The defendant]: <u>Like if there is any business work, or sending workers for him.</u> I can do a lot of things, God willing. Try not to forget what I asked you for, this is a matter of destiny for me. . . . Tell him that I want to get in touch with the head of the company, and I have a lot of business. . . . This is my most important wish. <u>And tell him that I am doing my share.</u>

34. Approximately two days later, on or about January 23, 2010, the defendant and Facilitator 3 had an electronic

exchange in which Facilitator 3 stated that his "boss" had told him that he would fix an appointment to speak to the defendant by telephone.

35.   Approximately two days later, on or about January 25, 2010, the defendant had a phone conversation with an individual whom Facilitator 3 introduced him to, identified herein as Individual 2.  In that conversation, the defendant told Individual 2 that it did not matter to him what "company" he was with as long as the company's faith was clear and the defendant knew it was a true company.  The defendant added that he "wasn't in this" to make connections or to get to know people in high ranks, but only to do his job.  He added, "they give me what I need, tell me where to go, and I don't need to know people.  I have strong faith and know exactly the company I'm working for."

36.   On or about February 11, 2010, the defendant and Facilitator 3 had the following electronic exchange referencing "marriage" to "the seventy."  As indicated in paragraph 38b, this reference is to marriage with seventy virgins, which the investigation has revealed is code for martyrdom.

        [Facilitator 3]: The brother who was talking with you the other day —

        [The defendant]: Yes.

        [Facilitator 3]: He said, "he had the intentions of coming here and getting married."  I told him, "I don't know."

        [The defendant]: Who has the intention of

getting married?   Who has the intention of getting married?

[Facilitator 3]: You, you.
. . .
[The defendant]: Ah, yeah, yeah, now I understand, yeah, yeah. . . . The one of seventy right?

[Facilitator 3]: Yes.

[The defendant]: Yes, the one of the seventy ones?

[Facilitator 3]: Yes, he told me — the one of the seventy ones . . . I told him, "I do not know," and he said, "if he wants to get married or wants to come to work with us over here."

[The defendant]: <u>If I come over there, you know, then I want the bride with the crown, not 70 at the beginning, you understand.</u>

37.   Electronic surveillance has revealed that in the time period between April 2009 and the present, the defendant has had numerous conversations with members of the facilitation network about "farming."   The investigation has revealed that "farming" is code for conducting terrorist attacks.   For example, in an electronic conversation with an individual based in Iraq identified herein as Individual 3, the defendant stated: "Try to avoid using names. . . . They monitor your IP address, and know when you enter the brothers' website, and especially in your country.   For example when I want to name the brothers, I say the farmers . . . because they plant metal and harvest metal and flesh."

38.   Electronic surveillance has uncovered numerous instances in the time period between April 2009 and the present where the defendant expressed rage at the American invasion of Iraq and a desire to take revenge on the United States.   For example:

a.   In a phone conversation with his mother on October 19, 2009, the defendant stated, "Like if an enemy comes inside your country mother, there should not be anyone left out, big or small, everyone has to stand up and fight, woman, man, boy, girl, anyone and everyone, do you understand?"

b.   In a phone conversation with his mother on November 9, 2009, the defendant talked about the "infidel enemy" entering a Muslim country and stated that it is everyone's responsibility to fight that enemy.   He mentioned jihad and asked, "Do you know mother that when a martyr dies, he would have 7 characteristics.   First, he receives forgiveness for all his sins, then he gets to see his own seat in Paradise. . . . Also he gets to have 70 virgins."   The defendant added that his greatest wish was to die a martyr.

c.   In a phone conversation on January 9, 2010, the defendant stated, "There is no more pressing duty after the declaration of faith than fighting the enemy.   Fighting comes before the other 4 pillars of faith."

d.   In a phone conversation on July 21, 2010, the

defendant stated, "Our motive should always be doing good for others. But if we see harm coming from someone, we warn them, and if they don't listen, we kill them. Islam came for the good of humanity. So if someone doesn't like good, we fight them, like those dog Americans."

       e.   In a phone conversation on May 28, 2010 with his sister, who was living in Iraq, the defendant said "Go learn about weapons and go attack the police and Americans. Let it be that you die."

WHEREFORE, your deponent respectfully requests that an arrest warrant be issued for the defendant FARUQ KHALIL MUHAMMAD 'ISA, also known as "Faruk Khalil Muhammad 'Isa," "Sayfildin Tahir Sharif" and "Tahir Sharif Sayfildin," so he may be dealt with according to law.  Because of the nature and content of the charges alleged herein, the government requests that the complaint and arrest warrant be filed under seal until further order of this Court.

JOHN J. MAZZELLA
Criminal Investigator
U.S. Attorney's Office

Sworn to before me