# Federal Defenders
## OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David E. Patton
*Executive Director and*
*Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

January 16, 2018

<u>By ECF and Electronic Mail</u>
The Honorable Roslynn R. Mauskopf
United States District Court Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:   <u>United States v. Faruq Khalil Muhammad 'Isa</u>, 11-CR-819 (RRM)

Your Honor:

This letter is in support of the Court's acceptance of Mr. 'Isa's plea to Count One of the indictment, pursuant to an agreement with the government which stipulates a sentence of 26 years.[1]

## I.   Offense Conduct

We believe that a Rule 11(c)(1)(C) plea agreement, with a stipulated sentence of 26 years, is appropriate in Mr. 'Isa's case.

---

[1] This letter will be filed on ECF with redactions.  We will provide the Court and the government with unredacted copies.



### A. Benchmark case that supports the proposed agreement

The case of *United States v. Wesam al Delaema*, 5-cr-337 (D.D.C.), is instructive.  Mr. Delaema received a sentence of 25 years pursuant to an 11(c)(1)(C) agreement.

Like Mr. 'Isa, Mr. al Delaema was born in Iraq.  Al Delaema traveled to Europe in 1993 and applied for asylum in Greece shortly after he was arrested by Greek police.  His asylum application was rejected, and he was expelled.  Later, he applied for asylum in the Netherlands, but withheld the rejection of his earlier asylum application in Greece.  He was granted Dutch citizenship in 2001.  Like Mr. 'Isa, he was assimilated into the society of his adoptive country.  Al Delaema learned Dutch ('Isa, English) and worked as a hair dresser ('Isa, in construction).

In 2003, al Delaema returned to Fallujah, Iraq, supposedly for a wedding.  While there, he made propaganda supporting the insurgency, including a film called *Warriors of Fallujah*.  In

the film, Mr. al Delaema can be seen *personally* emplacing at least one roadside IED in the ground, and boasting about killing American soldiers.  The next day, less than 12 hours later, Mr. al Delaema filmed the aftermath of several IED explosions, including a burned U.S. Army vehicle.  He also filmed an insurgent attack on an Iraqi municipal building.  Within three days of Mr. al Delaema emplacing the roadside bomb, IEDs had killed numerous people in Fallujah, including two American soldiers.  *See* Doc. No. 99, Government Sentencing Memorandum, 05-cr-337 (Apr. 3, 2009).

Mr. al Delaema pled guilty to one count of 18 U.S.C. 2332(b)(2), conspiracy to murder, as has been proposed in Mr. 'Isa's case, with an agreed upon sentence of 25 years.  ████ Mr. al Delaema was not necessarily the proximate cause of a death—though in Mr. al Delaema's case it was far more likely, and the conduct was far more hands-on.  And like Mr. 'Isa, Mr. al Delaema was not someone from the United States—or Tunisia—who became radicalized and decided to travel to a foreign county to do jihad.  Mr. 'Isa and Mr. al Delaema were both watching from afar as their home countries declined into violence after the American invasion.

If anything, Mr. al Delaema's conduct was more egregious.  Mr. al Delaema personally dug at least one IED into the ground, and talked about other IEDs that his group had emplaced.  He enthusiastically expressed his desire that his IED would kill Americans, and Americans and Iraqis were in fact killed by IEDs over the next few hours and days.  Additionally, during his pre-trial incarceration, Mr. al Delaema participated in the brutal beating of a guard, kicking him until he was unconscious.  Finally, unlike in Mr. 'Isa's case, the extradition agreement in al Delaema's case required that the United States would not oppose service of the sentence in the Netherlands.  Mr. al Delaema was transferred to Rotterdam where his sentence was reduced to 8 years and he was immediately eligible for early release.

## II.  18 U.S.C. 3553(a) Factors

A number of the factors that the Court ordinarily considers at sentencing are relevant to determining whether the proposed plea agreement and stipulated sentence are appropriate.

### A.  3553(a)(1): the offense conduct and history and characteristics of Mr. 'Isa

 Mr. 'Isa's history and characteristics, which merit the proposed sentence, are outlined below.

Mr. 'Isa was born in Iraq and moved to Mosul with his family as a teenager.  It was a diverse family, as Mr. 'Isa's father's relatives are Kurdish, and part of his mother's family is Yazidi from Sinjar.  The family was very poor.  His father drove a passenger bus and later worked as a truck driver.  While he slept, Mr. 'Isa, as a young boy, would help clean the truck for him between trips.  His father's salary was barely enough for food and clothes.  Even compared to other families in the neighborhood, they were poor.

Mr. 'Isa was conscripted into compulsory military service at the age of 18, during the height of the Iran-Iraq War.  Younger enlisted soldiers in the Army at the time were treated poorly—especially if they had Kurdish family—and both death and desertion were normal.  Mr. 'Isa deserted after approximately six months in the Army.  He was caught, and was sent back to his base in al-Qurnah, near Basra, where he remained in custody for a period of time.  Later, when Iraq was preparing to invade Kuwait, Mr. 'Isa again fled the Army and returned to Mosul where he worked as a carpenter. ██████████████████

Mr. 'Isa's younger brother, Tariq, left the Army in 1991 because he, too, did not believe in the war in Kuwait or the rampant corruption in the Army.  Mr. 'Isa and Tariq decided to flee to Turkey in December 1991, where they spent more than 13 months at Kangal Refugee Camp, also known as Sivas Camp.  During their time at the camp, they were able to meet with representatives from the United Nations, and Canadian resettlement officials. ██████████████
████████████████████████ He was ultimately granted asylum in Canada.

Mr. 'Isa arrived in Toronto, Canada with his brother Tariq in 1993.  He lived an assimilated and secular life there.  In Canada, Mr. 'Isa was not particularly connected to any mosque communities, drank alcohol often, and had a diverse group of friends of different religions, nationalities, and ethnicities.  To all who know him—including his lawyers—he has no animosity for any group of people. ████████████████████████

Mr. 'Isa worked in construction during his years in Canada.  At one job site, he lost several fingers on one hand due to a workplace accident with a bending machine.  At the time of his arrest he was working in stucco.

In 2005, after his father's death, Mr. 'Isa traveled to Iraq to visit for a while.  What he saw in Mosul was a city in chaos.  What had once been a diverse and tolerant city was now a place where race and sect became your identity.  And for the majority Sunni population, the new Shia government was the worst case scenario.  Under occupation, it was a very different place than the city Mr. 'Isa had left in 1991.  There was no law.

On December 28, 2005, Mr. 'Isa and another family member were at 'Isa's sister's house when they received a call that Mr. 'Isa's youngest brother, Ibrahim, had received terrible burns over 75% of his body, at their parents' house.  Ibrahim had been working in the garage, and was covered in oil.  When he lit a cigarette that he'd taken from their mother, he caught on fire.  Mr. 'Isa was unable to get back to the house to help Ibrahim, because there was a military curfew in place at the time that nobody—not even civilian ambulances—were allowed to break.  So they had to wait until the next day to return to their parents' house to help.  It was too late.  Ibrahim died at the hospital two weeks later.

An incredible sadness descended on the family.  But as one family member put it, "so much sadness happens in our lives in Iraq that we keep it in our hearts.  I don't think that Faruq became more religious or anything after this. [But] after [Ibrahim's] death, Faruq sat at home all day."

In 2006, Mr. 'Isa moved to Edmonton, worked for a construction company, and sent money to his family in Iraq, when he could.

Mosul continued to be one of the most volatile and violent places in Iraq.  And the effects of the war on Mr. Isa's family continued, and continue to this day. ██████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████

In June 2016, Mr. 'Isa's brother Ahmed was killed by an airstrike.  And in March or April 2017, Mr. 'Isa's sister-in-law and a nephew were killed in the fighting in Mosul.  Several of the children in the family were orphaned.  Decimated by fighting, Mr. 'Isa's family and city have been suffering for almost two decades.

**B. 3553(a)(2): a sentence to (A) reflect the seriousness of the offense, promote respect for the law, and provide just punishment; (B) provide deterrence to criminal conduct; (C) protect the public; and (D) provide needed educational, vocational, or medical treatment**

A sentence of 26 years in custody will reflect the seriousness of engaging in support of individuals seeking to kill U.S. soldiers.  A sentence of 26 years will promote respect for the law, showing that offenses against U.S. soldiers will be pursued and prosecuted for as many years as it takes to obtain a conviction and serious punishment. ███████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████ ███████████████████████████████████████████████

A sentence of 26 years in custody will provide specific deterrence to Mr. 'Isa, first through incapacitation.  Mr. 'Isa is 50 years old.  He has been in custody since his arrest in Canada in 2011.  If Mr. 'Isa were a free white male with a high school education, his current life expectancy would be approximately 76.5 years.  *See United States v. Jenkins*, 854 F.3d 181, 186 n.2 (2d Cir. 2017) (citing Ctr. for Disease Control, U.S. Life Tables, 2014, Nat'l Vital Statistics Rep., June 30, 2016, at 8, available at: http://www.cdc.gov/nchs/data/nvsr/nvsr65/nvsr65_04.pdf.).[2]  But "the life expectancy of an incarcerated person drops significantly for each year of incarceration."  *Id.* (citing Evelyn J.

---

[2] Note that as an Iraqi male his life expectancy is in fact shorter than that projected in these tables.

Patterson, *The Dose–Response of Time Served in Prison on Mortality: New York State, 1989–2003*, 103 Am. J. of Pub. Health 523, 526 (2013)). For each year incarcerated, there is a two-year decline in life expectancy. *See* Evelyn J. Patterson, *The Dose–Response of Time Served in Prison on Mortality: New York State, 1989–2003*, 103 Am. J. of Pub. Health 523 (2013).

As a result. even if Mr. 'Isa is able to earn all of his good time credit while in custody, a term of 26 years will mean that Mr. 'Isa has 16 years remaining on his sentence. He would be 66 at the time of release, while incarceration will have reduced his projected life expectancy to 59 years.



In the recent report by the United States Sentencing Commission, recidivism was least likely to occur in individuals with a criminal history category of I, an age of greater than 50 at the time of sentencing, and an age at the time of release at above 60 years old. The rate of recidivism for an individual released after age 60 was 16.0%. United States Sentencing Commission, *Recidivism Among Federal Offenders: A Comprehensive Overview*, p.23.

Finally, with regards to general deterrence, a sentence longer than 26 years would not provide any additional deterrent effect. The degree of certainty of punishment, as opposed to the specific length and severity of that punishment, provides the strongest general deterrence effect. *See United States v. Lawrence*, 254 F. Supp. 3d 441, 442-46 (E.D.N.Y. June 6, 2017) (JBW) (summarizing expert testimony that there is no reliable evidence that appreciably longer periods of incarceration for violent crimes have a general deterrent effect on the population). Furthermore, general deterrence relies on a calculated analysis on the part of potential future offenders. *See id.* at 443. To be effectively deterred by a sentence in the instant case, the would-be offender would have to have some idea of the sentence ultimately imposed in Mr. 'Isa's case, appreciate the likelihood both of detection and of prosecution in the United States, and engage in a rational cost-benefit analysis focused on self-preservation and largely unaffected by ideology. Even assuming that potential future offenders could engage in this cost-benefit analysis, the research suggests that such decision-making is not responsive to the specific punishment that is imposed.[3] A sentence of 26 years, imposed on a 50-year-old man, is more than sufficient to provide adequate general deterrence.

---

[3] *See generally* Steven Raphael & Jens Ludwig, *Prison Sentence Enhancements: The Case of Project Exile, in* EVALUATING GUN POLICY 251 (Jens Ludwig & Philip J. Cook, eds., 2003); Richard Rosenfeld, Robert Fornango & Eric Baumer, *Did* Ceasefire, Compstat, *and* Exile *Reduce Homicide?*, 4 CRIMINOLOGY & PUB. POL'Y 419 (2005); Colin Loftin & David McDowall, *"One with a Gun Gets You Two": Mandatory Sentencing and Firearms Violence in Detroit,* 455 ANNALS AM. ACAD. POL. & SOC. SCI. 150 (1981); Colin

### C.  3553(a)(4): the applicable guidelines

Mr. 'Isa's stipulated sentence falls squarely within the guideline calculation for conspiracy to commit murder, less the enhancement for a terrorism offense, *see* USSG § 3A1.4, which in Mr. 'Isa's case would call for life. ████████████████████████████████

Pursuant to USSG § 2A1.5, because the conspiracy resulted in death the appropriate guideline is the guideline for first degree murder, § 2A1.1.  The base offense level for first degree murder is 43.  Subtracting 3 levels for acceptance of responsibility brings the total offense level to 40, which in criminal history category I results in a guideline range of imprisonment of 292 to 365 months.  The sentence of 26 years, or 312, months falls in the middle of this guideline.

### D.  3553(a)(6): avoiding unwarranted sentencing disparities

As detailed in our benchmark case discussion above, ████████████████████████ ███████████ a sentence of 26 years would be within a nationally accepted range of negotiated sentences.

## III. Conclusion

For the aforementioned reasons, as well as other reasons discussed by the parties, we believe that a Rule 11(c)(1)(C) plea to a term of 26 years is appropriate.  Please let us know if you would like us to provide further documentation in support of this proposal.

---

Loftin, Milton Heumann & David McDowall, *Mandatory Sentencing and Firearms Violence: Evaluating an Alternative to Gun Control,* 17 L. & SOC'Y REV. 287 (1983); Colin Loftin & David McDowall, *The Deterrent Effects of the Florida Felony Firearm Law,* 75 J. CRIM. L. & CRIMINOLOGY 250 (1984); David McDowall, Colin Loftin & B. Wiersema, *A Comparative Study of the Preventive Effects of Mandatory Sentencing Laws for Gun Crime,* 83 J. CRIM. L. & CRIMINOLOGY 378 (1992); John J. Donohue III, *Assessing the Relative Benefits of Incarceration: Overall Changes and the Benefits on the Margin, in* DO PRISONS MAKE US SAFER? THE BENEFITS AND COSTS OF THE PRISON BOOM 269 (Steven Raphael & Michael Stoll eds., 2009); Thomas A. Loughran, Edward P. Mulvey, Carol A. Schubert, Jeffrey Fagan, Alex R. Piquero & Sandra H. Losoya, *Estimating a Dose–Response Relationship Between Length of Stay and Future Recidivism in Serious Juvenile Offenders,* 47 CRIMINOLOGY 699 (2009).

Thank you for your consideration of this letter.

Respectfully Submitted,

_____/s/_____

Samuel Jacobson
Mildred Whalen
Sabrina Shroff
Assistant Federal Defenders

cc:     AUSA Peter Baldwin (via ECF)
        AUSA Alexander Solomon (via ECF)
        AUSA Tiana Demas (via ECF)