

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

PWB
F. #2010R02201

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

February 6, 2018

By ECF, Hand Delivery, and Email

Honorable Roslynn R. Mauskopf
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

        Re:    United States v. 'Isa
                  Criminal Docket No. 11-819 (RRM)

Dear Judge Mauskopf:

        As the Court is aware, the parties in the above-referenced matter have agreed to enter into a plea agreement pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), with a recommended sentence of 26 years' imprisonment. This letter provides additional information relevant to the Court's consideration of the proposed plea agreement and further explanation as to why the Court should accept the plea agreement.

        I.        Legal Standard

        Rule 11(c)(3)(A) of the Federal Rules of Criminal Procedure provides that, if presented with a plea agreement pursuant to Rule 11(c)(1)(C), "the court may accept the agreement, reject it, or defer a decision until the court has reviewed the presentence report." Section 6B1.1(c) of the Guidelines mirrors the language of Rule 11(c)(3)(A).

        Section 6B1.2(c) of the Guidelines sets forth the standards for acceptance of a Rule 11(c)(1)(C) plea agreement. As pertinent here, Section 6B1.2(c) provides that "the court may accept the agreement if the court is satisfied either that: (1) the agreed sentence is within the applicable guideline range; or (2) (A) the agreed sentence is outside the applicable guideline range for justifiable reasons; and (B) those reasons are set forth with specificity in the statement of reasons form." Whether to accept a plea agreement rests within the Court's discretion. See United States v. Severino, 800 F.2d 42, 45 (2d Cir. 1986); United States v. Torres-Echavarria, 129 F.3d 692, 696 (2d Cir. 1997). However, "[d]eference ought to be paid to sentencing bargains because prosecutors are in the best position to make decisions about what sentence to pursue in plea negotiations." United States v. Espar, Inc., 15-CR-28 (JG), 2015 U.S. Dist. LEXIS 30469, at *2 (E.D.N.Y. Mar. 10, 2015).

    II.    <u>Factual Background</u>

The defendant is a 50-year-old Iraqi-Canadian citizen who, at the time of his arrest, resided in Canada. On July 3, 2012, the defendant was charged in a superseding indictment with: conspiracy to murder U.S. nationals, in violation of 18 U.S.C. § 2332(b)(2); the substantive murders of five U.S. soldiers, in violation of 18 U.S.C. § 2332(a)(1); and conspiracy to provide material support to terrorists, in violation of 18 U.S.C. § 2339A.

    A.    *Background on the Facilitation Network*

The defendant belonged to a foreign fighter facilitation network that recruited fighters in Tunisia and arranged for their transportation to Iraq, where they committed suicide attacks against American and Coalition forces. The facilitation scheme involved two groups of prospective attackers – one group that departed from Tunisia in or about October 2008 (the "October 2008 Group") and another group that planned to depart from Tunisia in or about March 2009 (the "March 2009 Group"). The October 2008 Group successfully entered Iraq and was responsible for two suicide attacks: an attack on March 31, 2009, which killed 17 Iraqi police officers; and an attack on April 10, 2009, which killed five U.S. soldiers and two Iraqi police officers. The March 2009 Group was unsuccessful in its efforts to enter Iraq.

The October 2008 Group consisted of four prospective Tunisian suicide bombers (Co-Defendant 1 and Co-Conspirators 1-3). Co-Conspirator 1 and Co-Conspirator 2 committed the March 31, 2009 suicide attack, and Co-Conspirator 3 committed the April 10, 2009 suicide attack. Co-Defendant 1 was captured in Iraq before he was able to conduct an attack. The March 2009 Group also consisted of four prospective Tunisian suicide bombers.

The facilitation network also consisted of several other Tunisia-, Syria-, and Iraq-based co-conspirators who recruited the Tunisian prospective suicide bombers and coordinated their movement from Tunisia to Syria and, ultimately, into Iraq. For example, Syria-based Co-Conspirator 6 and other Syria-based co-conspirators coordinated the travel of the October 2008 Group from Tunisia to Syria, housed the operatives in the October 2008 Group once they reached Syria, and helped arrange for the operatives' transport into Iraq. In addition, Iraq-based Co-Conspirator 4 and other Iraq-based co-conspirators worked to arrange for the travel of the October 2008 Group from Syria into Iraq. Once the Tunisian operatives entered Iraq, other Iraq-based co-conspirators were responsible for planning the attacks and providing the operatives with the improvised explosive devices ("IEDs") that were used to conduct the attacks that were intended to kill U.S. soldiers.

    B.    *The Defendant's Role in the Facilitation Network*

During the period of the planned travel and the attacks, the defendant was in communication with Syria- and Iraq-based members of the facilitation network, as well as with certain of the Tunisian attackers in both the October 2008 Group and the March 2009 Group. The defendant was not responsible for recruiting the Tunisian attackers, nor was he principally responsible for coordinating the attackers' travel into Syria and Iraq. Furthermore, the defendant did not plan the attacks carried out by the Tunisian operatives in the October 2008 Group.

Nevertheless, the defendant was aware that the prospective suicide bombers in the October 2008 Group and the March 2009 Group sought to enter Iraq to commit lethal suicide attacks against U.S. and Coalition forces. Further, as explained below, the defendant knowingly undertook efforts to assist the prospective suicide bombers achieve their desired result.

i. The October 2008 Group

Syria- and Iraq-based members of the facilitation network were responsible for coordinating the movement of the Tunisian suicide bombers in the October 2008 Group into Syria and Iraq. The defendant discussed – via email and online instant messaging applications – the logistics of the Tunisian operatives' travel with multiple Syria- and Iraq-based co-conspirators. As part of the conspiracy, the defendant suggested that Syria-based Co-Conspirator 6 contact Iraq-based Co-Conspirator 4 to facilitate the travel of the October 2008 Group from Syria to Iraq so that they could commit suicide attacks intended to kill U.S. soldiers. The defendant also contacted Co-Conspirator 4 to seek his assistance in helping the Tunisian operatives in the October 2008 Group enter Iraq from Syria. In addition, the defendant communicated directly with certain members of the October 2008 Group. During these communications – via email and instant messaging applications – the defendant offered words of encouragement and religious guidance.

For example, on March 2, 2009, the defendant and Iraq-based Co-Conspirator 4 discussed how the October 2008 Group would enter Iraq from Syria and what kind of training the Tunisian operatives would require:

> **Co-Conspirator ("CC") 4**: I spoke to the big company[1] in regards to the boys.
>
> **DEFENDANT**: [Iraq-based Co-Conspirator 5] told me that their situation is deteriorating and they are squeezed.
>
> **CC 4**: And yesterday I spoke with [Tunisian Co-Defendant 1] in Syria. The boys made a mistake by entering Syria and I told [Tunisian member of the March 2009 Group].
>
> **DEFENDANT**: Why and where do you want them to go?
> **CC 4**: They were supposed to arrange it first before they go . . . . [Tunisian member of the March 2009 Group] wants to go to Syria and I told him not to make the same mistake.
>
> **DEFENDANT**: What did the big company tell you?
>
> **CC 4**: I told [Tunisian member of the March 2009 Group] to stay in his country till the boys get in and this will make their entrance much easier . . . If it is

---

[1] The government interprets "big company" to be a reference to a terrorist organization.

3

> possible, get in touch with [Tunisian member of the March 2009 Group] . . . talk with him in the Iraqi language, so he can learn.
>
> **DEFENDANT**: Yes brother, we talked about this subject.
>
> **CC 4**: And the group in Syria too.
>
> **DEFENDANT**: Those ones are with [Syria-based Co-Conspirator 6] and they know a little bit.
>
> **CC 4**: Teach them the expressions that are more commonly used by us, especially the car driver.[2]
>
> **DEFENDANT**: Issue them personal IDs as if they are mute.
>
> **CC 4**: If they go in they will not want to delay. They will want to get married.
>
> **DEFENDANT**: Which marriage?
>
> **CC 4**: Marriage to the 72.[3]

On March 3, 2009 and March 4, 2009, the defendant and Co-Conspirator 4 communicated regarding the October 2008 Group's travel. During these communications, Co-Conspirator 4 confirmed that "[t]he guys will be going in" to Iraq.

On March 8, 2009, the defendant and Co-Conspirator 4 communicated again regarding the October 2008 Group's travel:

> **CC 4**: So as to wrap up the issue of helping the boys get in.
>
> **DEFENDANT**: Yes, the one who shows the good way is the same like the one who is doing the deed.
>
> **CC 4**: But I asked [Syria-based Co-Conspirator 6] for [Iraq-based co-conspirator] and he did not send it to me yet. This [Iraq-based co-conspirator] knows [Syria-based co-conspirator] and we want to inquire from him about [Syria-based co-conspirator].
>
> **DEFENDANT**: Which [Iraq-based co-conspirator]?

---

[2] The government interprets "car driver" to be a reference to the use of a vehicle borne improved explosive device ("VBIED").

[3] The government interprets "marriage" and the "72" to be references to martyrdom and the supposed reward of 72 virgins in paradise as a reward of martyrdom.

4

>**CC 4**: [Iraq-based co-conspirator], friend of [Syria-based Co-Conspirator 6].
>
>**DEFENDANT**: I told you, he was inside with [Syria-based Co-Conspirator 6] but I do not know what company he was in.  Ask them from which company was the brother . . . . as much as I know, he always used to tell them "I did not come here because of you, I am here because of the Americans."

On March 18, 2009, the defendant communicated with Iraq-based Co-Conspirator 4 about facilitating the travel of the October 2008 Group and the March 2009 Group into Iraq: "[Brother] is sending you his regards and said Allah helped them in their trip . . . him and his friends . . . and he is telling if you can bring in [Tunisian member of the March 2009 Group] and his group."  He added, "May Allah be with them and make their path easy and don't you forget, brother, that they are foreigners so their success in entering or not is our responsibility."

On March 19, 2009, on or about the date that the October 2008 Group is believed to have entered Iraq, the defendant told Iraq-based Co-Conspirator 5, "The brothers who were nearby you entered by you today with the help of God.  The brothers heard about the news in their country today and were very happy.  A fall down in adoration to thank God is expected of this news.  For the entry of the first group.  Thank God for the brothers' entry."

On March 20, 2009, the defendant asked a Tunisian member of the March 2009 Group, "And how are the brothers there in our place?  Anything new about them?"  The Tunisian member of the March 2009 Group replied, "They are fine, praise God.  They called yesterday.  No my brother.  There is nothing new so far."  The defendant asked if the Tunisian member of the March 2009 Group had spoken to them by phone and the Tunisian member of the March 2009 Group responded, "They contacted the brothers in Syria."

On April 6, 2009, one week after the March 31, 2009 attack that killed 17 Iraqi policemen, the defendant wrote an email to Syria-based Co-Conspirator 6, stating, "By God's will, the brothers [Tunisian Co-Conspirator 1] and [Tunisian Co-Conspirator 2], have passed away."

On April 11, 2009, the day after the April 10, 2009 attack resulting in the deaths of five U.S. soldiers, the defendant had the following conversation with Iraq-based Co-Conspirator 5:

>**DEFENDANT**: Did you hear about the huge incident yesterday?  Is it known?
>
>**CC 5**: Yes.
>
>**DEFENDANT**: He was one of the Tunisian brothers
>
>**CC 5**: Praise God, may God acknowledge him.
>
>**DEFENDANT**: Amen.  And did you know the details about it??

5

**CC 5**: No

**DEFENDANT**: [Tunisian member of the March 2009 Group] told me.

On April 12, 2009, two days after the April 10 attack, the defendant told Iraq-based Co-Conspirator 4, "Yesterday, [Tunisian member of the March 2009 Group] called me and said the big crackles/bangs were by one of the Tunisian brothers."

On April 15, 2009, the defendant and Iraq-based Co-Conspirator 4 discussed whether Co-Defendant 1, the fourth member of the October 2008 Group (the remaining members were all deceased by this point in time), had committed a suicide attack yet:

**CC 4**: I am not sure if [Co-Defendant 1] got married yet or not.

**DEFENDANT**: Why? Haven't you seen him? Are you keeping in touch?

**CC 4:** He called me a few days ago.

**DEFENDANT:** Have you seen each other?

**CC 4**: Security reasons.

The defendant's communications establish that the defendant and Co-Conspirator 4 intended to assist the Tunisian operatives in the October 2008 Group enter Iraq so that the Tunisians could commit attacks intended to kill U.S. soldiers.

    ii.    <u>The March 2009 Group</u>

The investigation also revealed that the defendant was in communication with the prospective Tunisian suicide operatives in the March 2009 Group. For example, on or about March 20, 2009, the defendant advised one of the Tunisian members of the March 2009 Group about that individual's planned attempt to travel to Iraq:

**MARCH 2009 GROUP MEMBER ("MGM"):** The brothers in Syria have approved the trip.

**DEFENDANT:** Praise God.

**MGM:** God willing we will be there after two days. Things will be fine, God willing.
. . .

**DEFENDANT**: May God make things easy for you and for us.

**MGM**: The brothers here told me not to tell anybody until we get there.

6

**DEFENDANT**: Yes this is proper.

. . .

**MGM**: Your friend [Syria-based co-conspirator] shouldn't know until we get there. Then I will talk to him, God willing.

. . .

**MGM**: My brother, what do you advise me to do with my family?

**DEFENDANT:** In what way?

**MGM**: Should I leave a will with them? I never talked to them about leaving. Otherwise, they would never let me go.

**DEFENDANT:** No. No, I don't recommend this. This will cause them to suffer after you . . . . Also, try to delete everything. I mean everything off your computer. Don't leave one character of information or anything behind. Don't leave any of your belongings in the house. Don't leave any trace.

**MGM**: Yes brother. What else?

**DEFENDANT**: Do not forget to keep reading Qur'an and repeat the famous prayers on the way until you meet with God.

. . .

**MGM**: The family is the main problem, particularly my mother.

**DEFENDANT**: Any particular problem?

**MGM**: I am so concerned about . . . the shock

**DEFENDANT**: I don't know what to tell you brother, but what I know now is that the things we are about to do are duty on us

. . .

**MGM**: May God give you 74 to marry. We want the virgins of paradise, not the ones here.

**DEFENDANT**: You come short, brother. God is more generous than that. It's supposed to be 76 instead.

    iii.    <u>Continued Communications After the Attacks</u>

In addition, following the March 2009 and April 2009 attacks, the defendant maintained contact with and offered support to jihadist groups in Iraq, which were plotting

attacks against Americans. During this period, the defendant offered to provide personnel, in the form of himself, to the facilitation network.

For example, on January 21, 2010, the defendant had the following conversation with Iraq-based Co-Conspirator 5:

**DEFENDANT:** Listen brother, you need to know something, okay?

**CC 5:** God willing

**DEFENDANT:** I want you to do this favor for me. This is the only favor I ask you in this world my brother. Tell the one in charge at work to send my greetings to the head of the company. This is the only thing I am asking in this life. Okay brother

**CC 5**: God willing- the company.
. . . .

**DEFENDANT**: When you see the one in charge, tell him about me.

**CC 5**: Till now, I haven't seen him yet. Only -

**DEFENDANT**: You know this is not a simple thing and it requires these things. Particularly these days where there are many thieves. One has to be vigilant on all sides. You know what I mean?

**CC 5**: Yes, I swear -

**DEFENDANT**: One should be smart and wise. Be careful of computers and phones. A lot of trouble can come out of them.

**CC 5**: Yes, Amen
. . . .

**DEFENDANT**: Yeah. You just try to make the recommendation through the phone. Say to him: "He is not just 100% but 1,000,000% with you. He is with you on the doctrine, the loyalty and enmity and everything one million percent."

**CC 5**: God willing

**DEFENDANT:** Write this down somewhere with you, that I am at the Al-Tahaddy (ph) the challenge Network. They know it. My nickname/title is Mouthil El Tawagheet (ph) (the Oppressor or of Idol Worshipers).

**CC 5**: Mouthil El Tawagheet?
. . . .

**DEFENDANT**: The only one I could register at is AI-Tahaddy. Can you hear me?

**CC 5**: Yes

. . . .

**DEFENDANT**: I mean even if I can't work over there, I can get some business going here to benefit us or the… But don't say these things to any of the normal workers. Only with the boss/the one in charge

**CC 5**: Yes, God willing. I have a friend who can . . .

**DEFENDANT**: Don't tell these things to just anyone

**CC 5**: He is in charge

**DEFENDANT**: Tell him that I used to send workers[4] before

**CC 5**: He is in charge for four workers/laborers now.

**DEFENDANT**: Just try to meet him a quick meeting. Tell him you are in a hurry. Tell him, "I have a brother who is idle but he can open a business" Do you understand?

**CC 5**: Yes

**DEFENDANT**: Do you understand

**CC 5**: Yes I understand

**DEFENDANT**: Yes, say, "He was able to send workers before, praise be to Allah." Do you understand?

**CC 5**: Yes, I gave him an idea about workers and stuff

**DEFENDANT**: Yes brother but try to be very careful and be smart when you talk to him. Don't tell him these things over the phone. Tell him you have something important to talk to him about. Because these things are . . . Yes be careful and smart. Even when you meet someone, or when you go meet someone, or when you go about your work, make sure to turn your phone off. Or better yet, remove the battery from it.

**CC 5**: Yes

---

[4] The government interprets "workers" to be a reference to suicide bombers.

9

>**DEFENDANT**: Yes this is not a joke
>
>**CC 5**: No it isn't
>
>**DEFENDANT**: Try to work on this thing for me. Say to him, "I just want someone to go on Al-Tahaddy network and register there" Okay? And he can correspond with me from there.

On January 20, 2011, U.S. law enforcement authorities conducted a <u>Mirandized</u> post-arrest interview of the defendant in Canada. During this interview, the defendant admitted that he knew that the Tunisian operatives in the October 2008 Group and the March 2009 Group were traveling and attempting to travel to Iraq in order to engage in attacks targeting U.S. forces. The defendant stated that he was introduced to the individuals in the October 2008 Group by Syria-based Co-Conspirator 6, and the Tunisian operatives and Syrian co-conspirators asked for the defendant's assistance in helping the October 2008 Group travel into Iraq. The defendant stated that he contacted Iraq-based Co-Conspirator 4 to see if he could assist the October 2008 Group. The defendant also stated that he was aware that three members of the October 2008 Group conducted attacks and the fourth member had been arrested.

In sum, the defendant was a willful and knowing participant in the conspiracy to facilitate the travel of Tunisian suicide operatives into Iraq to conduct attacks intended to kill U.S. forces. However, in relation to the Tunisian operatives and the Syria- and Iraq-based members of the conspiracy, the defendant's role in the conspiracy was comparatively minor. Notably, the defendant remained in Canada throughout the entirety of the conspiracy. He did not recruit or personally meet with the Tunisian operatives who conducted the attacks or with the other Syria- and Iraq-based members of the facilitation scheme. Nor did he plan the attacks carried out by the October 2008 Group. The defendant's principal efforts to assist the conspiracy consisted of suggesting that a Syria-based co-conspirator contact an Iraq-based co-conspirator to facilitate the travel of the Tunisian suicide bombers from Syria to Iraq so that the Tunisians could commit attacks intended to kill U.S. soldiers. The defendant also contacted the Iraq-based co-conspirator to seek assistance in helping the Tunisian operatives enter Iraq from Syria. In addition, the defendant offered words of encouragement and religious guidance to his co-conspirators. Further, the defendant's communications regarding the March 2009 Group – which did not successfully travel to Iraq – demonstrate that he provided limited logistical advice to the prospective Tunisian operatives.

### III. The Sentencing Guidelines Calculation

Pursuant to the 11(c)(1)(C) plea agreement, the defendant is expected to plead guilty to count one of the superseding indictment, charging conspiracy to murder U.S. nationals. The government calculates the defendant's Sentencing Guidelines offense level as follows:

> Base Offense Level (§§ 2A1.5, 2A1.1)                         43

| | |
|---|---:|
| Terrorism Enhancement (§ 3A1.4) | +12 |
| Acceptance of Responsibility (§ 3E1.1) | –3 |
| Total Offense Level | 52 |

At present, the government is not aware of any prior criminal history for the defendant. However, because the defendant is pleading guilty to a crime of terrorism (see 18 U.S.C. § 2332b(g)(5)(B), which lists 18 U.S.C. § 2332 as a "federal crime of terrorism"), his criminal history category automatically is increased to Category VI. (See U.S.S.G. § 3A1.4). The resulting advisory Sentencing Guidelines range of imprisonment is life. The statutory sentencing range for this violation is between zero years of imprisonment and life imprisonment. (See 18 U.S.C. § 2332(b)(2)).

As noted above, the parties have jointly agreed upon a sentence of 26 years' imprisonment, pursuant to Rule 11(c)(1)(C).

IV. Analysis

The Court should accept the plea agreement because the negotiated disposition appropriately balances the seriousness of the defendant's conduct against the significant prosecutorial risks and burdens avoided through a negotiated resolution, and it permits careful allocution of prosecutorial and other governmental resources, which would otherwise be devoted to extensive pretrial and trial litigation.

On the one hand, as discussed above, the defendant committed profoundly serious crimes: he knowingly participated in a conspiracy that sent foreign fighters into Iraq to kill American forces. Certain of those foreign fighters successfully entered Iraq and committed suicide attacks that resulted in the deaths of, among others, five U.S. service members. Following the attacks, the defendant maintained contact with and offered support to jihadist groups who plotted to attack Americans. The defendant posed a real danger to American lives and interests overseas, and accordingly deserves a very serious sentence.

On the other hand, had the government and the defendant not reached a plea agreement, the government would have been faced with the risk of trial, which in all cases includes the risk of adverse verdicts on one or more counts. Moreover, had the defendant elected to proceed to trial, or to exercise all of his pretrial litigation options, the government likely would have been required to engage in substantial litigation, including, at a minimum, litigating a motion to suppress the defendant's post-arrest statements. Any hearing on such a motion would likely involve testimony not only from multiple U.S. law enforcement witnesses, but also from multiple foreign law enforcement witnesses. Moreover, if the case proceeded to trial, substantial and time-consuming efforts would have to be undertaken to secure the testimony of foreign witnesses who are located in multiple countries. Regardless of whether this foreign witness testimony would be obtained live at trial or via Rule 15 deposition, the efforts to locate the foreign witnesses and to coordinate and secure the requisite approvals to obtain the testimony of these witnesses from the governments of the countries where the witnesses reside or are currently

incarcerated would be a significant and resource-intensive undertaking. As the Court is aware, such litigation can be unusually burdensome even in the most straightforward cases, and it can pose exceptional burdens where, as here, complex issues are present. Nor do such burdens fall solely on the Department of Justice and the investigating agencies associated with the Joint Terrorism Task Force. Rather, trial and pretrial litigation in national security cases requires coordination with other U.S. government agencies and with foreign governments.

Where the government can secure a substantial sentence that adequately reflects the Section 3553(a) factors without causing additional burdens to its counter-terrorism apparatus, it is in the national security interest of the United States to do so. In the judgment of the government, the mutual concessions in the plea agreement in this case accomplish those twin aims by providing the sentencing court with the opportunity to impose a significant, but reasonable sentence in light of the defendant's acceptance of responsibility and by permitting the government to focus its resources on additional offenders and additional threats. See generally United States Attorney's Manual § 9-27.420.

Courts have long recognized such interests as appropriate bases for the exercise of prosecutorial discretion:

> This broad discretion rests largely on the recognition that the decision to prosecute is particularly ill-suited to judicial review. Such factors as the strength of the case, the prosecution's general deterrence value, the Government's enforcement priorities, and the case's relationship to the Government's overall enforcement plan are not readily susceptible to the kind of analysis the courts are competent to undertake. Judicial supervision in this area, moreover, entails systemic costs of particular concern.

Wayte v. United States, 470 U.S. 598, 607 (1985); see also Hon. John Gleeson, Idea: The Sentencing Commission and Prosecutorial Discretion: The Role of the Courts in Policing Sentencing Bargains, 36 Hofstra Law Review 639, 656 n.68 (2008) ("Although the Supreme Court used that language [in Wayte] in addressing the decision whether to prosecute, it is equally applicable . . . to whether an arguably reasonable sentence bargain is appropriate.").

Balanced against the above-listed prosecutorial interests, a custodial sentence of 26 years will adequately reflect the seriousness of the actual offense behavior and not undermine the statutory purposes of sentencing or the sentencing Guidelines. The proposed plea agreement preserves the Court's authority to impose a significant sentence that serves the statutory interests of sentencing and is commensurate with the defendant's offense conduct in furtherance of the above-described conspiracy. Notably, and as described above in detail, evidence uncovered during the investigation revealed that other co-conspirators were more responsible for facilitating the Tunisian suicide bombers' entry into Iraq, and those co-conspirators provided the destructive devices and other equipment for the suicide missions. Further, the defendant is approximately 50 years old. The agreed-upon sentence will result in his imprisonment at least until he is approximately 70 years old, whereupon, pursuant to the terms of the plea agreement, he will be immediately removed from the United States. For these reasons, the government respectfully

submits that the agreed-upon sentence is reasonable and appropriate, and the Court should accept the plea agreement.

        The government has consulted with the surviving family members of the five U.S. soldiers killed in the April 10, 2009 suicide attack. Some of these family members support the proposed resolution, while others do not. Nevertheless, the government respectfully requests that the Court accept the plea agreement or, at a minimum, take the defendant's guilty plea and defer acceptance of the plea agreement until after a Presentence Report has been prepared.

        Respectfully submitted,

        RICHARD P. DONOGHUE
        United States Attorney

By:    /s/ Peter Baldwin
        Peter Baldwin
        Alexander Solomon
        Tiana Demas
        Assistant U.S. Attorneys
        (718) 254-7000

cc:    Clerk of the Court (RRM)
        Defense counsel